UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Vicki Scott,

    Plaintiff,

 vs.       REPORT AND RECOMMENDATION

Michael J. Astrue,[1]
Commissioner of Social
Security,

    Defendant.  Civ. No. 06-4032 (PAM/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I. Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social

Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the Commissioner's

final decision which denied her application for Disability Insurance Benefits ("DIB").

The matter is now before the Court upon the parties' cross-Motions for Summary

Judgment. The Plaintiff has appeared by Sean M. Quinn, Esq., and the Defendant has

appeared by Lonnie F. Bryan, Assistant United States Attorney. For reasons which

---

[1]On February 12, 2007, Michael J. Astrue became the Commissioner of Social
Security, and pursuant to Rule 25(d)(1), Federal Rules of Civil Procedure, we have
substituted him as the named Defendant.

follow, we recommend that the Defendant's Motion for Summary Judgment be granted, and that the Plaintiff's Motion be denied.

## II.  Procedural History

The Plaintiff first applied for DIB on October 16, 2003, at which time, she alleged that she had become disabled on August 25, 2002.  [T. 61-63].  The Plaintiff met the insured status requirement at the alleged onset date of disability, and remains insured for DIB through December 31, 2007.  [T. 15].

On January 12, 2004, the State Agency denied the claim upon initial review, and upon reconsideration.  [T. 29-35, 40, 43-45].  The Plaintiff made a timely request for a Hearing before an Administrative Law Judge ("ALJ") and, on October 20, 2005, a Hearing was conducted, at which time, the Plaintiff appeared personally, and by an attorney.  [T. 15, 796].   The ALJ kept the record open for twenty (20) days following the Hearing, for the submission of the Plaintiff's recent medical records. [T. 15, 799, 820].  Thereafter, on March 23, 2006, the ALJ issued a decision denying the Plaintiff's claim for benefits.   [T. 12-26].   On April 21, 2006, the Plaintiff requested an Administrative Review before the Appeals Council, [T. 11], which, on August 31, 2006, denied the claim for further review.  [T. 7-9].  Thus, the ALJ's determination became the final decision of the Commissioner.  See, Grissom v. Barnhart, 416 F.3d

- 2 -

834, 836 (8th Cir. 2005); Steahr v. Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson

v. Chater, 108 F.3d 942, 943-44 (8th Cir. 1997); 20 C.F.R. §§404.981, and 416.1472.

III.   Administrative Record

A.   Factual Background.  The Plaintiff was forty-nine (49) years old at the

time of the Hearing.  [ T. 61].  The Plaintiff has worked as an insurance service

associate, a law enforcement dispatcher, a reservationist, a cashier, an administrative

assistant, and as the owner of a distribution company.  [T. 79].

The Plaintiff alleges that she has been unable to work full-time since August 25,

2002, due to kidney problems, high blood pressure, depression, anxiety, and

degenerative disc and joint disease.  [T. 29-32].

1.   Medical Records Before Alleged Onset Date of August 25, 2002.

In July of 1999, the Plaintiff injured her back at work.  [T. 533].  On January 31, 2000,

the Plaintiff was seen for her chronic low back pain.  [T. 173].  The Plaintiff reported

that she walked several times per week for exercise.  Id.  The physician observed that

the Plaintiff appeared more comfortable than she had at previous visits.  Id.

On February 29, 2000, the Plaintiff underwent an electrocardiogram, with normal

results.  [T. 474].  On March 1, 2000, the Plaintiff presented at the emergency room,

complaining of pain in her right hand and forearm.  [T. 266].  The Plaintiff reported

that she might have strained her arm while moving boxes.  Id.  She was prescribed ibuprofen, and discharged.  [T. 267].

On March 9, 2000, an X-ray was taken of the Plaintiff's chest, right foot, and right hand, after she complained of arthritis and numbness.  [T. 473, 533].  The X-ray revealed no acute evidence of abnormalities, but osteoarthritic changes were observed in the Plaintiff's right hand.  [T. 473, 534].

On March 27, 2000, the Plaintiff was seen on a follow-up visit for her chronic low back pain.  [T. 172].  The physician observed that the objective medical findings showed that the Plaintiff's back was doing well, and opined that the Plaintiff's depression was contributing to her symptoms.  Id.  The Plaintiff's physician recommended minimal work restrictions, including lifting no more than twenty-five (25) pounds, and bending, kneeling, walking, pushing, pulling, and climbing only occasionally.  [T. 171].

On April 12, 2000, the Plaintiff was seen by a rheumatologist, and complained of pain, swelling, and numbness, in her right hand.  [T. 530].  She reported that she worked on the computer and performed hand crafts, including sewing.  Id.  The rheumatologist suspected carpal tunnel syndrome, or tendonitis, and prescribed a wrist splint.  Id.  On April 17, 2000, the Plaintiff reported that her right hand had improved

with the use of a wrist splint.  [T. 529].  She cancelled her remaining appointments with the rheumatologist.  Id.

On April 18, 2000, the Plaintiff was seen at a follow-up visit for her chronic low back pain.  [T. 170].  She reported that she was not attending physical therapy because her prior employer had refused to pay for the sessions.  Id.  The Plaintiff reported that she was lifting up to twenty-five (25) pounds, and that her pain had improved.  Id.  An MRI scan revealed mild degenerative disc disease, but the Plaintiff's physician concluded that she had reached maximum medical improvement. Id.  He recommended minimal work restrictions, including lifting more than thirty-five (35) pounds only rarely, and changing positions frequently.  [T. 169].

On May 22, 2000, the Plaintiff attended a follow-up visit for her chronic low back pain.  [T. 168].  The Plaintiff reported that she would be beginning a new position, as an insurance service associate, and her physician concluded that the Plaintiff's condition would not limit her ability to work in that capacity.  Id.

On June 6, 2000, the Plaintiff presented at the emergency room, complaining of shoulder pain.  [T. 263].  The Plaintiff reported that she was diagnosed with the

Coxsackie virus[2] in May of 2000, which caused pain in her left chest and shoulder. Id. The Plaintiff was then taking Vicoprofen,[3] Amitriptyline,[4] and Tylenol. Id. The physician noted that the Plaintiff had a palpable muscle spasm along her shoulder blade. Id. A chest X-ray revealed no abnormalities. [T. 472]. The Plaintiff was prescribed Valium.[5] [T. 263].

On June 17, 2000, the Plaintiff presented at the emergency room, complaining of pain, tingling, and swelling, in her left arm and hand. [T. 260]. The Plaintiff reported that she had been referred for physical therapy, in order to improve her range of motion in her shoulder, but that she had not followed up on the referral. Id. The

---

[2]The Coxsackie virus produces "a disease resembling poliomyelitis but without paralysis, as well as a disease with fever and rash." Dorland's Illustrated Medical Dictionary, at 415 (29th Ed. 2000). Poliomyelitis is "an acute infectious disease occurring sporadically or in epidemics and caused by a virus, usually a poliovirus but occasionally a coxsackievirus," and is "characterized clinically by fever, sore throat, headache, and vomiting, often with stiffness of the neck and back." Id. at 1427.

[3]Vicoprofen is "indicated for the short-term (generally less than 10 days) management of acute pain." Physician's Desk Reference, pp. 534 (60th ed. 2006).

[4]Amitriptyline hydrochloride is "a tricyclic antidepressant * * * also having sedative effects[.]" Dorland's Illustrated Medical Dictionary, at 62 (29th Ed. 2000).

[5]Valium is "indicated for the management of anxiety disorders or for the short-term relief of the symptoms of anxiety." Physician's Desk Reference, pp. 2822 (60th ed. 2006).

physician noted that the Plaintiff had a weak grasp, but felt that she was not "making a full effort." Id. The Plaintiff was prescribed Tramadol,[6] and referred for an MRI scan. Id. On June 26, 2000, following the MRI scan, the Plaintiff was diagnosed with cervical radiculopathy. [T. 155-58, 186-87]. At a neurosurgery consultation on July 5, 2000, the surgeon observed that the Plaintiff had good range of motion in her neck, and no significant muscle pain or spasm. [T. 184-85]. The physician concluded that she was a candidate for a discectomy,[7] as well as a fusion of her vertebrae. Id.

On July 11, 2000, the Plaintiff was admitted to St. Luke's Hospital for her discectomy, and vertebrae fusion. [T. 156]. No complications followed the surgery, and the Plaintiff was prescribed Darvocet,[8] and Flexeril,[9] and referred for physical therapy. [T. 156, 166]. At a follow-up visit, on August 16, 2000, an X-ray revealed

---

[6]Tramadol hydrochloride is "indicated for the short-term (five days or less) management of acute pain." Physician's Desk Reference, pp. 2463 (60th ed. 2006).

[7]A discectomy, or diskectomy, is the "excision of an intervertebral disk[.]" Dorland's Illustrated Medical Dictionary, at 526 (29th Ed. 2000).

[8]Darvocet is "indicated for the relief of mild to moderate pain, either when pain is present alone or when it is accompanied by fever." Physician's Desk Reference, pp. 3497 (60th ed. 2006).

[9]Flexeril is "indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions." Physician's Desk Reference, pp. 1833 (60th ed. 2006).

normal alignment of her cervical spine.  [T. 182-83, 194].  The Plaintiff's physician concluded that she could return to work on August 21, 2000, so long as she refrained from lifting more than fifty (50) pounds.  [T. 182-83].  On October 2, 2000, at another follow-up visit, the Plaintiff was fully released from any restrictions.  [T. 181].  At a subsequent visit, on November 10, 2000, the Plaintiff reported that she had not been performing her prescribed strengthening and stretching exercises.   [T. 167].  Nonetheless, the surgeon observed that her forward bending was mildly limited, and her lumbar flexibility was good, with no muscle spasms or tightness.  Id.

On October 8, 2000, the Plaintiff presented at urgent care, complaining of frequent urination, and discomfort in her lower back.  [T. 385].  A urinalysis ruled out a urinary tract infection.  Id.  On November 29, 2000, the Plaintiff underwent a cytoscopy.[10]  [T. 482].  Her urine tested negative for the presence of malignant cells. Id.  On May 16, 2001, the Plaintiff presented at urgent care, complaining of frequent urination.  [T. 376].  The physician noted that the Plaintiff's appendix and gallbladder

---

[10]A cytoscopy is an "examination of cells."   Dorland's Illustrated Medical Dictionary, at 454 (29th Ed. 2000).

- 8 -

had been previously removed.  Id.  She was diagnosed with a urinary tract infection, and prescribed Cipro.[11]  Id.

In March of 2001, the Plaintiff began to see a therapist, during a time of difficult personal circumstances.  [T. 351].  She was diagnosed with adjustment disorder, with depressed mood.  Id.  Her therapist noted that, after the Plaintiff moved away from a troubled personal relationship, her symptoms seemed to resolve.  Id.  On July 25, 2002, the Plaintiff presented at urgent care, complaining of anxiety, relating to her father's illness, and the premature birth of her grandchild.  [T. 373].  She was prescribed Ativan.[12]  [T. 374].

2.  Medical Records After The Alleged Onset Date of August 25, 2002.  The Plaintiff cared for her father during his final illness, and took a leave of absence from work shortly before his death, in order to cope with her grief and anxiety.  [T. 344, 348-50].  After her father died, in August of 2002, she began seeing a therapist.  [T. 347].  She was initially diagnosed with adjustment disorder, with

---

[11]Cipro, or Ciprofloxacin, is "indicated for the treatment of infections[.]" Physician's Desk Reference, pp. 2993 (60th ed. 2006).

[12]Ativan is a trademarked preparation of lorazepam.  See, Dorland's Illustrated Medical Dictionary, at 167 (29th Ed. 2000).  Lorazepam is a benzodiazepine with anxiolytic and sedative effects," for "the treatment of anxiety disorders and short-term relief of anxiety symptoms[.]"  Id. at 1027.

anxiety and depressed mood.  Id.  The Plaintiff informed her therapist that she was extremely depressed, and had no desire to return to work.  Id.  In October and November of 2002,[13] the Plaintiff reported that she had traveled to her father's home, cleaned out the contents, and arranged an auction.  [T. 342].  The Plaintiff also cancelled her hysterectomy, and stopped taking Ativan, continuing only on Paxil.[14] Id.  Her therapist noted that the Plaintiff's symptoms of depression were fairly stable in November of 2002.  Id.  The Plaintiff also reported feeling hopeful, given her increased financial stability.  Id.

On November 15, 2002, the Plaintiff told her therapist that she would be traveling, by airplane, to visit her son.  [T. 341].  She also reported an improved financial condition.  Id.  On January 3, 2003, the Plaintiff informed her therapist that she had decided not to return to her former employment.  Id.  Instead, the Plaintiff stated that she hoped to start her own business, and to complete some business coursework.  Id.  The Plaintiff reported only one (1) recent anxiety attack, which she

---

[13]The Plaintiff's therapist dated one of her notes as November 1, 2001, but it appears that this was a clerical error, as the Record shows that the appointment occurred on November 1, 2002.  [T. 342].

[14]Paxil is indicated for the treatment of a major depressive disorder, panic disorder, social anxiety disorder, and anxiety disorder, among others.  See, Physician's Desk Reference, pp. 1503 (60th ed. 2006).

- 10 -

described as minor.  Id.  She told her therapist that she had been very active, and going out with friends.  Id.

On November 18, 2002, the Plaintiff presented at urgent care, complaining of a cough, and shooting pains in her shoulder.  [T. 371].  She was diagnosed with bronchitis.  Id.  A chest X-ray revealed no evidence of disease.  [T. 469].

On December 3, 2002, the Plaintiff was seen by Dr. Mark Plachta, who practiced internal medicine, and requested a comprehensive evaluation of her malaise, cholesterol, insomnia, skin lesions, and left shoulder pain.  [T. 437].  Dr. Plachta noted that the Plaintiff had been diagnosed with nephrolithiasis,[15] which had previously required the placement of a stent, and that she had a history of pain in her lumbar region and cervical spine.  Id.  The Plaintiff also reported that she had been prescribed Paxil, for panic attacks, and Ambien,[16] for insomnia.  Id.  She denied any joint swelling or abdominal pain.  [T. 438].  Dr. Plachta's orthopedic and neurologic examinations of the Plaintiff's shoulder revealed no abnormal results.  Id.  The Plaintiff declined any further evaluation of her left shoulder.  Id.  With respect to her mental health concerns,

---

[15]Nephrolithiasis is a "condition marked by the presence of renal calculi." Dorland's Illustrated Medical Dictionary, at 1186 (29th Ed. 2000).

[16]Ambien is "indicated for the short-term treatment of insomnia."  Physician's Desk Reference, pp. 2868 (60th ed. 2006).

Dr. Plachta observed that the Plaintiff was overweight, but well-groomed, and in no apparent distress.  Id.  He opined that her malaise and insomnia were related to stress from recent family events.  Id.  He recommended continuing her Paxil, and adding Amitriptyline.  Id.  He also diagnosed leukocytosis,[17] stemming from the Plaintiff's smoking habit, as well as elevated blood pressure, and hypertriglyceridemia,[18] and recommended a follow-up visit.  Id.

On January 30, 2003, the Plaintiff was seen by Dr. Plachta, complaining of pain in her neck and left shoulder.  [T. 435].  Dr. Plachta requested X-rays of the Plaintiff's left shoulder and cervical spine.  Id.  On February 3, 2003, at a follow-up visit, Dr. Plachta noted that the Plaintiff's cervical spine film showed a stable fusion, and her shoulder X-ray revealed no abnormalities.  [T. 434, 443].  He recommended physical therapy and physiatry.  [T. 434].  He also noted that the Plaintiff's bloodwork, relating to her leukocytosis was normal.  Id.

---

[17]Leukocytosis is "a transient increase in the number of leukocytes in the blood," which is "seen normally with strenuous exercise and pathologically accompanying hemorrhage, fever, infection, or inflammation."  Dorland's Illustrated Medical Dictionary, at 984 (29th Ed. 2000).

[18]Hypertriglyceridemia is "an excess of triglycerides in the blood."  Dorland's Illustrated Medical Dictionary, at 859 (29th Ed. 2000).

On February 17, 2003, the Plaintiff was seen for a neurosurgery consultation, complaining of increasing shoulder pain, neck pain, and intermittent arm pain. [T. 178]. The physician observed that the Plaintiff had limited range of motion in her neck, and recommended an MRI scan, and an X-ray of her cervical spine. Id. In a patient questionnaire dated February 19, 2003, the Plaintiff stated that she had been experiencing pain in her neck, shoulders, and left arm, for five (5) to six (6) months. [T. 190]. On February 20, 2003, an X-ray of the Plaintiff's cervical spine revealed slight hypermobility at her C4-C5 vertebrae, but no other abnormalities. [T. 466].

In February of 2003, the Plaintiff attended two (2) physical therapy sessions. [T. 222]. She denied any improvement in her condition. [T. 222-23]. On March 19, 2003, the Plaintiff was discharged from physical therapy, after cancelling an appointment. [T. 222].

On March 3, 2003, at her follow-up appointment, the Plaintiff continued to complain of increased pain in her neck. [T. 177]. The physician noted that the Plaintiff's range of motion in her neck was limited, due to the fusion of her vertebrae, but the X-ray revealed no instability in her cervical spine, and the MRI revealed no spinal cord or nerve compression. Id. The physician concluded that the Plaintiff's

- 13 -

symptoms were myofascial, and he referred her for a physical medicine and rehabilitation consultation.  Id.

On April 7, 2003, the Plaintiff was seen by the physical medicine physician, who diagnosed cervical and thoracic strain.  [T. 200].  The physician observed that she had limited cervical range of motion, and tenderness.  [T. 199].  He prescribed Ultram,[19] and Skelaxin,[20] and stated that he would consider trigger point injections, if the symptoms persisted.  [T. 200].  On May 6, and June 5, 2003, the Plaintiff was seen for a follow-up visit, and she was diagnosed with cervical and thoracic myofascial pain, and referred for acupuncture and physical therapy.  [T. 197-98].  On June 19, 2003, the Plaintiff's physician concluded that she was capable of returning to work, with no limitations.  [T. 196].  In May and June of 2003, the Plaintiff was seen for several physical therapy sessions, and she cancelled several others.  [T. 214, 216-20].  She

---

[19]Ultram is a trademarked preparation of tramadol hydrochloride.  See, Dorland's Illustrated Medical Dictionary, at 1909 (29th Ed. 2000).  Tramadol hydrochloride is "an opioid analgesic used for the treatment of moderate to moderately severe pain[.]"  Id. at 1862.

[20]Skelaxin is "indicated as an adjunct to rest, physical therapy, and other measures for the relief of discomforts associated with acute, painful musculoskeletal conditions."  Physician's Desk Reference, pp. 1685 (60th ed. 2006).

- 14 -

was discharged from physical therapy in August of 2003, and her therapist noted that she was doing well.  Id.

On July 11, 2003, the Plaintiff was seen by Dr. Plachta, and reported that she suffered intermittent bleeding during bowel movements.  [T. 433].  An examination revealed external hemorrhoids, and the Plaintiff was referred for a colonoscopy.  Id. On July 13, 2003, Dr. Plachta prescribed Anusol hydrocortisone suppositories.  [T. 432].  On July 31, 2003, during a follow-up visit, Dr. Plachta concluded that the Plaintiff's bleeding was likely due to proctitis, or her hemorrhoids. [T. 431].

On July 16, 2003, the Plaintiff was admitted to St. Luke's Hospital for abdominal pain, nausea, vomiting, and diarrhea.  [T. 203].  She was diagnosed with diverticulitis,[21] dehydration, hyponatremia,[22] and mild left hydronephrosis and

---

[21]Diverticulitisis is an "inflammation of a diverticulum, especially inflammation related to colonic diverticula, which may undergo perforation with abscess formation." Dorland's Illustrated Medical Dictionary, at 537 (29th Ed. 2000).  A diverticulum is "a circumscribed pouch or sac of variable size occurring normally or created by herniation of the lining mucous membrane through a defect in the muscular coat of a tubular organ."  Id.

[22]Hyponatremia is a "deficiency of sodium in the blood."  Dorland's Illustrated Medical Dictionary, at 864 (29th Ed. 2000).

hydroureter.[23]  [T. 202].  A CT scan of her abdomen revealed no evidence of a bowel

obstruction, diverticulitis, or colitis, but it disclosed mild left hydronephrosis and mild

left hydroureter.  [T. 201].  Her condition improved with antibiotics and fluids, and she

was prescribed Levaquin, Metronidazole, Diflucan, Paxil, and Amitriptyline.[24]  [T.

202].

In August of 2003, the Plaintiff's therapist diagnosed her with a Major

Depressive Disorder, and a history of anxiety.  [T. 340].  The Plaintiff reported that

her symptoms of depression and anxiety had increased in recent months, in part due

to her financial struggles.  Id.  On August 29, 2003, the Plaintiff was seen by Dr.

---

[23]Hydronephrosis is the "distention of the pelvis and calices of the kidney with urine, as a result of obstruction of the ureter."  Dorland's Illustrated Medical Dictionary, at 842 (29th Ed. 2000).  Hydroureter is the "abnormal distention of the ureter with urine or with a watery fluid, due to obstruction[.]"  Id. at 843.

[24]Levaquin is used "to treat or prevent infections that are proven or strongly suspected to be cause by susceptible bacteria."  Physician's Desk Reference, pp. 2455 (60th ed. 2006).

Metronidazole is "an antiprotozoal and antibacterial[.]"  Dorland's Illustrated Medical Dictionary, at 1107 (29th Ed. 2000).

Diflucan is a trademarked preparation of fluconazole.  Dorland's Illustrated Medical Dictionary, at 500 (29th Ed. 2000).  Fluconazole is "an antifungal agent used in the systemic treatment of candiasis and cryptococcal meningitis[.]"  Id. at 687.

Plachta, regarding her insomnia and depression.  [T. 430].  Dr. Plachta discontinued

the Plaintiff's Amitriptyline, and prescribed Paxil, and Trazodone.[25]  Id.

On September 2, 2003, the Plaintiff underwent a colonoscopy, with revealed no

obstructions, defects, or abnormalities.  [T. 465].  On September 4, 2003, an X-ray

of the Plaintiff's abdomen revealed a potential calculus.  [T. 464].  On September 10,

2003, the Plaintiff underwent an intravenous pyelogram ("IVP"),[26] which revealed no

calcifications in her urinary tract.  [T. 442].  The Plaintiff's kidneys and bladder

appeared normal, but the IVP revealed a partial obstruction of the distal ureter.  Id.

On September 14, 2003, the Plaintiff presented in the emergency room,

complaining of shoulder pain, and rectal bleeding, as well as fatigue, chills, and blood

in her urine.  [T. 252].  The Plaintiff was diagnosed with dysfunctional uterine bleeding,

and was discharged.  [T. 253].  On September 22, 2003, the Plaintiff reported a three

(3) day fever and frequent urination to Dr. Plachta, and was prescribed Levaquin.  [T.

429].  On September 29, 2003, the Plaintiff presented in the emergency room,

---

[25]Trazodone hydrochloride is "an antidepressant used to treat major depressive episodes with or without prominent anxiety[.]"  Dorland's Illustrated Medical Dictionary, at 1868 (29th Ed. 2000).

[26]A pyelogram is a "radiograph of the kidney and ureter, especially showing the pelvis of the kidney."  Dorland's Illustrated Medical Dictionary, at 1498 (29th Ed. 2000).

complaining of back pain, and urinary pressure.  [T. 246].  She was diagnosed with back pain, persistent left hydroureter, and urinary abnormalities.  Id.  The physician noted that the Plaintiff was already scheduled for a cystoscopy, and a ureterography, and that she had recently had a colonoscopy, with normal results.  Id.  The Plaintiff also reported that she ran a fever approximately one (1) week earlier, and was prescribed Levaquin.  Id.  The Plaintiff was then taking Paxil and Trazodone.  Id.  A CT scan revealed no kidney stones. [T. 250-51].

On October 1, 2003, the Plaintiff was evaluated for hypertension, and prescribed Atenolol.[27]  [T. 427-28].  On October 2, 2003, the Plaintiff was admitted to St. Luke's Hospital for a cytoscopy, pyeloureterogram, ureteroscopy, and the placement of a left ureteral stent. [T. 454].   The stent was placed, without complications or blood loss.   Id.  Later testing of the Plaintiff's urine, which was collected during the cytoscopy, revealed no evidence of malignancy.  [T. 459].

On October 20, 2003, the Plaintiff underwent a chest X-ray, which revealed clear lungs, and no evidence of acute disease.  [T. 441].  On October 22, 2003, the Plaintiff was admitted to St. Luke's Hospital for a cystoscopy, ureteroscopy, and

_____

[27]Atenolol, which goes by the brand name of Tenormin, is "indicated in the management of hypertension."  Physician's Desk Reference, pp. 696 (60th ed. 2006).

neocystostomy, and for the removal and replacement of her left ureteral stent.  [T. 224].  An examination revealed that the Plaintiff suffered an obstruction from fibrous periureteral scarring, which necessitated a stent.  Id.  She suffered no complications from the procedure, and her pathology results were benign.  Id.  The Plaintiff was discharged four (4) days later, and prescribed Percocet, Keflex, and Nitrofurantoin.[28] Id.  Her physician recommended that she avoid driving, or lifting anything over ten (10) pounds.  [T. 225].

On November 8, 2003, the Plaintiff presented at the emergency room, and complained of vaginal pain, swelling, and irritation.  [T. 242-43].  The physician advised the Plaintiff to stop taking Nitrofurantoin, to continue taking Lortab,[29] and to

---

[28]Percocet is "indicated for the relief of moderate to moderately severe pain." Physician's Desk Reference, pp. 1114 (60th ed. 2006).

Keflex is a trademarked preparation of cephalexin.  See, Dorland's Illustrated Medical Dictionary, at 937 (29th Ed. 2000).  Cephalexin is "used in the treatment of infections of the urinary and respiratory tracts and of skin and soft tissues due to sensitive pathogens[.]"  Id. at 321.

Nitrofurantoin is a synthetic antibacterial, "used in the treatment of urinary tract infections due to susceptible bacteria[.]"  Dorland's Illustrated Medical Dictionary, at 1220 (29th Ed. 2000).

[29]Lortab is "indicated for the relief of moderate to moderately severe pain." Physician's Desk Reference, pp. 3315 (60th ed. 2006).

begin taking Ciprofloxacin. [T. 242]. On November 11, 2003, the Plaintiff was seen by Dr. Plachta, for a follow-up to her emergency room visit, and reported a fever and abdominal pain. [T. 424]. Dr. Plachta concluded that her abdominal pain was partially related to her stent, and possibly related to a urinary tract infection. Id. He discontinued the Plaintiff's Ciprofloxacin, and prescribed Augmentin.[30] Id.

On November 18, 2003, the Plaintiff was admitted to St. Luke's Hospital, complaining of poor appetite, chills, fever, and abdominal pain. [T. 279]. A CT scan revealed no evidence of hydroureter, or hydronephrosis. [T. 279, 299]. A chest X-ray revealed no evidence of acute cardiopulmonary disease, [T. 297], and her electrocardiogram was normal. [T. 300]. Her stent was removed, and she was prescribed Trazodone, Paxil, Tylenol, Diflucan, and Hydrocodone.[31] [T. 279]. She was medically stable upon discharge three (3) days later. Id.

On December 16, 2003, the Plaintiff was evaluated by Dr. Marlin Trulsen, a Social Security Administration psychologist, for depression and anxiety. [T. 301].

---

[30]Augmentin is "indicated in the treatment of infections," where caused by sinusitis, among other conditions. Physician's Desk Reference, pp. 1335 (60th ed. 2006).

[31]Hydrocodone is "a semisynthetic narcotic derivative of codeine having sedative and analgesic effects more powerful than those of codeine." Dorland's Illustrated Medical Dictionary, at 840 (29th Ed. 2000).

- 20 -

The Plaintiff reported that she lived alone, and was currently unemployed.  [T. 301-02].  She informed Dr. Trulsen that she left her employment, in February of 2003, due to medical problems.  [T. 302].  The Plaintiff stated that her depression began in August of 2002, upon the death of her father.  Id.

When Dr. Trulsen asked about her current interests, the Plaintiff replied that she enjoyed reading, writing, drawing, painting, computer use, and crafts.  [T. 303].  She reported that she visited her friends in the afternoon, after taking a nap.  Id.  She also stated that she was capable of cleaning, shopping, doing dishes and laundry, cooking, and performing yard work.  Id.  The Plaintiff stated that she managed her own finances.  [T. 304].

Dr. Trulsen diagnosed the Plaintiff with panic disorder, and noted that she continued to struggle with grief over her father's death.  Id.  He rated her current Global Assessment of Functioning ("GAF") score as 65.[32]  Id.  Dr. Trulsen

---

[32]The GAF scale considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  Diagnostic and Statistical Manual of Mental Disorders, (4th Ed., Text Revision, 2000), at 34.  On a 100 point scale, a rating of 41-50 represents serious symptoms or any serious impairment in social, occupational, or school functioning; a rating of 51-60 represents moderate symptoms or moderate difficulty in social, occupational, or school functioning; and a rating of 61-70 represents some mild symptoms, or some difficulty in social, occupational, or school functioning, but generally functioning pretty well and having

recommended counseling, and a bereavement support group.  [T. 305].  Dr. Trulsen

opined that the Plaintiff was capable of employment, which would involve regular

personal interaction.  Id.  He also stated that a gradual increase of working hours might

help the Plaintiff transition to full-time employment, and he felt that a position requiring

computer skills might be a good fit.  Id.

On January 7, 2004, the Plaintiff's mental residual functional capacity was

assessed by State Agency consultants.  [T. 392, 410].  A State Agency psychologist

concluded that the Plaintiff's anxiety disorder mildly restricted her activities of daily

living and social functioning.  [T. 402].   He found no evidence of extended

decompensation, but moderate difficulties with concentration.  Id.  He noted that the

Plaintiff reported she was capable of all household chores, and that she engaged in

reading, writing, and painting.  [T. 410].  The psychologist found that the Plaintiff's

ability to handle stress  was mildly impaired, and that she would have moderate

difficulty with detailed instructions, and marked difficulty with complex instructions.

Id.  He also concluded that the Plaintiff was able to concentrate on routine, repetitive,

---

some meaningful interpersonal relationships.  Id.

and detailed tasks, and that she was capable of interacting with co-workers and the public.  Id.

On that same date, a State Agency consultant assessed the Plaintiff's vocational capacity, and concluded that she was moderately limited in her ability to understand, remember, and carry out detailed instructions; and moderately limited in her ability to maintain attention and concentration, and to work in close proximity to others, without distraction.  [T. 406, 411-18].  The consultant concluded that the Plaintiff was capable of sitting, standing, or walking, each up to six (6) hours out of an eight (8) hour workday, and that she could lift ten (10) pounds frequently, and twenty (20) pounds occasionally.  [T. 412].  He recommended that she limit herself to occasional overhead reaching, climbing, balancing, stooping, kneeling, crouching, and crawling, and to avoid all vibration, as a result of her back fusion.  [T. 413-15].

On January 20, 2004, the Plaintiff was seen at the hospital for a follow-up visit. [T. 306].  A film showed no evidence of renal or ureteric calculi or obstructions.  Id. On January 30, 2004, the Plaintiff canceled an appointment with her urologist, reporting that her back pain continued, but that she was not running a fever.  [T. 491]. On February 7, 2004, the Plaintiff presented in the emergency room, complaining of left flank pain.  [T. 312].  An IVP revealed good flow in both ureters, and no overt

obstruction.  Id.   The Plaintiff received Flexeril, and physical therapy was recommended.  Id.  On February 18, 2004, the Plaintiff's urologist reviewed her kidney X-rays, and found no blockage or stones.  [T. 489].  The urologist was unable to determine a source for the Plaintiff's abdominal discomfort, based on the results of the X-rays.  Id.

The Plaintiff attended physical therapy from February through April of 2004. [T. 316-17].  She initially complained of muscle spasms in her back, near her kidneys. [T. 318].  By April 2, 2004, she reported that her pain had greatly decreased.  [T. 316]. On May 28, 2004, she was discharged from physical therapy. [T. 319].

In March and April of 2004, the Plaintiff regularly saw a therapist, who diagnosed her with adjustment disorder, with anxiety and depressed mood.  [T. 328-33].  The therapist observed that the Plaintiff's mental health concerns stemmed from some family difficulties.  [T. 333].

On July 27, 2004, the Plaintiff was seen by Dr. Plachta, and complained of fever and diarrhea.  [T. 421].  Dr. Plachta could not determine the source of the fever, but he noted that the Plaintiff stated that she had suffered flu symptoms for approximately one (1) month.  [T. 421-22].  He diagnosed malaise, secondary to the fever, but he noted no evidence of anemia.  [T. 422].  He recommended ibuprofen, and Paxil for

the Plaintiff's ongoing depression.  Id.  A chest X-ray revealed no active disease.  [T. 440].

On August 6, 2004, the Plaintiff presented at urgent care, complaining of elbow pain.  [T. 519].  She also reported intermittent fevers.  Id.  An X-ray revealed no abnormalities.  [T. 520, 522].  The physician was unable to determine the source of the Plaintiff's elbow pain, but prescribed Lortab.  [T. 519-20].  On August 9, 2004,  at a follow-up visit, the Plaintiff reported occasional fevers and fatigue.  [T. 591].

On September 14, 2004, the Plaintiff presented to the emergency room with abdominal pain. [T. 486, 506].  She was diagnosed with an acute urinary tract infection, but neither an IVP, nor a fluoroscopy, revealed any evidence of an obstruction.  [T. 486, 507, 515, 602].  She was admitted to St. Luke's Hospital for intravenous antibiotics.  [T. 486].  She was prescribed Ciprofloxacin, and Nitrofurantoin, and was discharged on September 16, 2004, without a fever.  [T. 502].  At discharge, a social worker from the hospital noted that the Plaintiff was capable of returning home, and caring for herself without assistance.  [T. 513].  The Plaintiff reported that she was currently a college student.  Id.

On September 20, 2004, the Plaintiff was seen for a fever.  [T. 484].  A CT scan of her abdomen revealed no abnormalities, and the physician was unable to determine a cause of the fever.  [T. 484, 493].

On February 8, 2005, the Plaintiff was seen for pain in her face and abdomen. [T. 589].   Although a urinalysis did not suggest pyelonephritis,[33] Dr. Plachta prescribed Levaquin and Tramadol.  [T. 590].  On February 11, 2005, a CT scan was taken of the Plaintiff's abdomen and pelvis, with normal results. [T. 573].   On February 22, 2005, the Plaintiff was seen for lumbar and abdominal pain, and myalgias. [T. 586].   An X-ray was taken of the Plaintiff's lumbar spine, which revealed degenerative changes of her L4-L5 vertebrae.  [T. 572].  When comparing the X-ray with one taken on July 13, 1999, the radiologist concluded that the degeneration had progressed, but he noted that the Plaintiff had undergone pelvis surgery since that time. Id.  Dr. Plachta diagnosed fibromyalgia.[34]  [T. 710-11].

_____

[33]Pyelonephritis is the "inflammation of the kidney and its pelvis because of bacterial infection[.]"   Dorland's Illustrated Medical Dictionary, at 1498 (29th Ed. 2000).

[34]Fibromyalgia is "pain and stiffness in the muscles and joints that is either diffuse or has multiple trigger points." Dorland's Illustrated Medical Dictionary, at 673 (29th Ed. 2000).

On February 28, 2005, the Plaintiff was seen for a fever and achiness, and reported a fever up to 104 degrees. [T. 708]. She was diagnosed with influenza. [T. 709].

On March 7, 2005, the Plaintiff was seen by Dr. Plachta for recurrent fevers, muscle aches, and fatigue. [T. 583]. Dr. Plachta noted an aortic murmur, [T. 584], and a subsequent echocardiogram revealed a slightly dilated left atrium. [T. 567]. Dr. Plachta concluded that the Plaintiff's fever and other symptoms were consistent with influenza and sinusitis. [T. 584].

On March 10, 2005, the Plaintiff was admitted to the hospital for leukocytosis, and possible Wegener's granulomatosis.[35]   [T. 527].   She was diagnosed with sinusitis.  [T. 555].  Within six (6) weeks, her sinusitis had greatly improved, with Augmentin, Clindamycin,[36] and steroid nasal spray. [T. 526].  On March 30, 2005, Dr. Plachta noted that the Plaintiff's leukocytosis was resolved, [T. 581], and that her

---

[35]Wegener's granulomatosis is "a multisystem disease chiefly affecting males, characterized by necrotizing granulomatous vasculitis involving the upper and lower respiratory tracts, glomerulonephritis, and variable degrees of systemic, small vessel vasculitis," and is "generally considered to be an aberrant hypersensitivity reaction to an unknown antigen." Dorland's Illustrated Medical Dictionary, at 770 (29th Ed. 2000).

[36]Clindamycin is "indicated for the topical treatment of inflammatory acne vulgaris." Physician's Desk Reference, pp. 3214 (60th ed. 2006).

blood counts were normal. [T. 689]. He also authored a letter, dated March 30, 2005, which advised that the Plaintiff's infection had prevented her from pursuing her college coursework, although he noted that her medication regimen would not prevent her studies. [T. 690].

On April 8 and 12, 2005, the Plaintiff was seen by Dr. Plachta for back pain. [T. 579-80]. Dr. Plachta initially recommended Tramadol, but then referred the Plaintiff for physical therapy. [T. 579]. With respect to the treatment of the Plaintiff's myalgias, Dr. Plachta recommended increased activity. [T. 580].

From April through August of 2005, the Plaintiff attended several physical therapy sessions. [T. 537-49]. Although the Plaintiff initially reported that her pain had improved, [T. 547], she later stated that her symptoms were unchanged, and the physical therapist recommended at-home use of a transcutaneous electrical nerve stimulation unit (a "TENS unit") to control her pain. [T. 541].

On April 28, 2005, the Plaintiff complained of lower back pain, and reported that her pain made daily activities difficult, including tying her shoes, riding in a car, and sitting. [T. 681, 683]. Her physician noted, however, that she was able to move around the room fairly easily. [T. 683]. On April 29, 2005, an MRI scan of the

Plaintiff's lumbar spine was taken. [T. 524]. The MRI revealed a small disc protrusion at the L4-L5 vertebrae, with mild elevation of the right L5 nerve root. Id.

On May 3, 2005, the Plaintiff was diagnosed with a major depressive disorder, with symptoms including weight gain, fatigue, difficulty sleeping, and feelings of worthlessness. [T. 620]. The therapist concluded that the Plaintiff's depression was severe, and had been ongoing for two (2) years, id., but also observed that the Plaintiff was neatly groomed, alert and oriented, with an intact memory and clear thought and perception. [T. 619]. The Plaintiff was then taking Tramadol, Paxil, and Amitriptyline. [T. 617]. She reported that she enjoyed writing fiction, and was currently working on a series of stories. Id. From May through August of 2005, the Plaintiff attended ongoing therapy sessions. [T. 609-16]. She also cancelled several other therapy sessions, due to medical issues. [T. 621-22]. Over this time, the therapist noted that the Plaintiff's mental health had deteriorated. [T. 609-16].

On May 11, 2005, the Plaintiff was seen after she fell at her home. [T. 578]. An X-ray was taken of the Plaintiff's chest, and lumbar spine and pelvis, which revealed no changes since March 7, 2005, and no acute findings. [T. 554]. The X-ray revealed mild degeneration of the L4-L5 vertebrae. Id.

Subsequently, the Plaintiff underwent epidural steroid injections. [T. 523, 604, 677]. On June 15, 2005, the Plaintiff reported that she had been running a low-grade fever, and that she had pain and tenderness at the site of the injection. [T. 523, 551]. A second MRI scan was taken of the Plaintiff's lumbar spine, which revealed no evidence of discitis or subcutaneous inflammation. [T. 523].   It did reveal a small nuclear herniation at the L4-L5 and L5-S1 vertebrae. Id. The interpreting physician concluded that the results were very similar to the Plaintiff's earlier MRI scan. Id. The physician also noted that the Plaintiff was able to ambulate, and to get up and down from the examination table, without discomfort. [T. 604]. He recommended physical therapy, and prescribed ibuprofen, Flexeril, and Lortab. Id.

On June 20, 2005, the Plaintiff was seen for pain in her lumbar spine and right groin, fever, and weakness in her right leg. [T. 576]. A radiologist noted that an X-ray of the Plaintiff's pelvis revealed advanced degenerative changes in her lower lumbar spine, but no acute abnormalities. [T. 550, 577].

On August 2, 2005, the Plaintiff was seen by Dr. Plachta for pain in her lumbar and groin, and fatigue and muscle aches. [T. 634]. Dr. Plachta diagnosed myalgias, chronic depression, and malaise. [T. 635].

In a letter dated August 29, 2005, in response to an inquiry from the Plaintiff's attorney, Dr. Plachta identified the Plaintiff's medical problems as:  nephrolithiasis; left ureteral obstruction; pyelonephritis; diverticulosis; allergic rhinitis; chronic lumbar and pelvic pain; chronic cervical pain with left arm radiculopathy; discectomy; chronic tobacco abuse; chronic anxiety and depression; obesity; fever of unknown origin; and chronic sinusitis.  [T. 606-07].  He expressed the view that she was unable to sustain full-time, competitive employment, as a result of her medical problems.  Id.

On September 2, 2005, the Plaintiff was seen by Dr. Plachta for a follow-up visit.  [T. 632].  She reported that her pain in her right elbow and pelvis had improved, but that she had ongoing fevers.  Id.  A CT scan, on September 30, 2005, revealed ovarian cysts, but no other masses.  [T. 630, 643].  Dr. Plachta advised the Plaintiff that her results revealed "nothing worrisome," and that the cysts would likely resolve without intervention.  [T. 653].

Subsequently, Dr. Plachta referred the Plaintiff for consultation with a hematologist, and an infectious disease specialist.  [T. 624-27].  The infectious disease specialist concluded that the Plaintiff's low-grade fevers were non-infectious. [T. 648, 661-62].  The hematologist found no objective data that accounted for the Plaintiff's symptoms.  [T. 649].  The hematologist concluded that the Plaintiff's symptoms may

result from a combination of her current medications.   Id.   He observed that the

Plaintiff appeared uncomfortable, though not in acutely debilitating pain.   Id.

        3.   Other Records.   In September of 2003, the Plaintiff cancelled an

appointment with her therapist, stating that her mother had taken a fall, and that the

Plaintiff was going to visit her.  [T. 338].  In October of 2003, the Plaintiff was evicted

from her apartment for nonpayment of rent.  [T. 336].  She temporarily resided at a

motel.  [T.91].

     On October 13, 2003, the Plaintiff completed a disability report, in support of

her claim for DIB.  [T. 77].  She reported immobilizing pain, nausea, fever, and chills,

as the conditions which precluded her from working.  Id.  She also reported that she

was then taking Percocet, Darvocet, Trazodone, Paxil, and Atenolol.  [T. 77, 83].  The

Plaintiff stated that her kidneys first bothered her on August 25, 2002, and that her

depression rendered her unable to work on the same date.  [T. 78].  The Plaintiff also

stated that she took a leave of absence from her prior employment, due to depression,

anxiety, and stress, relating to her father's death.  Id.  The Plaintiff stated that she had

intended to return to work in January of 2003, but began experiencing pain in

December of 2002.  Id.   The Plaintiff reported prior work experience as a service

associate, a law enforcement dispatcher, a reservationist, a cashier, an administrative

assistant, and an owner of a distribution company.  [T. 79]; see also, [T. 100-11].  The Plaintiff stated that, during her ownership of a distribution company, she delivered fifty (50) pound bottles of water.  Id.  She also reported that she had completed high school, and one (1) year of college.  [T. 84].

On November 10, 2003, a friend of the Plaintiff's completed a function report, relating to her claim for DIB.  [T. 91].  According to the friend's report, the Plaintiff lived alone, and spent her days sleeping and watching television, while lying in bed. Id.  The Plaintiff tired easily, and had experienced forgetfulness, due to her medication. [T. 93].  The Plaintiff prepared her own meals, including primarily soup, oatmeal, and crackers.  Id.  The Plaintiff only left her motel room in order to retrieve her medications, or to shop for food, and she traveled by taxi, because her medication and pain rendered her unable to drive. [T. 94].  The Plaintiff did manage her own finances. Id.  The friend reported that the Plaintiff seemed depressed.  [T. 96-97].

On November 26, 2003, the Plaintiff completed a questionnaire, relating to her activities of daily living.  [T. 112].  The Plaintiff reported that she was able to care for her personal hygiene, though she reported a fifty (50) pound weight gain since the onset of her alleged disability.  Id.  The Plaintiff stated that she often slept until 10:00 o'clock a.m., before showering, dressing, and receiving friends for visits.  Id.  The

Plaintiff reported that her only activities were sleeping, watching television, and attending medical appointments.  Id.  She reported that she no longer engaged in her hobbies, including shopping, going out with friends, traveling, writing, painting, reading, and sewing.  [T. 113].

The Plaintiff stated that she did not cook, clean, shop, or do laundry or yard work.  Id.  She took taxis to medical appointments, and relied on friends for anything else she needed.  Id.  Due to her physical condition, she lost her employment, and had been evicted from her apartment.  Id.  However, she professed to having a number of close friends, and being very sociable.  [T. 113-14].  The Plaintiff stated that she had difficulty showering, walking, dressing, and using the toilet.   [T. 116].   She also described difficulty in reading and maintaining concentration.   Id.   She stated, however, that she was enrolled in college coursework in January, February, and July of 2003.  [T. 117].

On May 11, 2004, the Plaintiff completed a second disability report, in which she appealed the initial denial of her DIB claim.  [T. 118].  She reported that she had suffered complications, following her surgeries in October of 2003.  Id.  She also reported excruciating muscle spasms, and ongoing depression.  Id.  The Plaintiff was then taking Paxil, Trazodone, and Flexeril.  [T. 121].  She reported no change in her

daily activities.  [T. 122].  On August 11, 2004, the Plaintiff completed a third disability report, in which she explained that she was now experiencing pain in her shoulder blades, and blood in her urine.  [T. 125].  She stated that she suffered from extreme fatigue, due to her muscle spasms.  [T. 129].

On August 16, 2005, the Plaintiff completed a fourth disability report, in which she reported that she had a mass in her left ureter tube and kidney, as well as immobilizing pain.  [T. 132].   She was then taking Percocet, Trazodone, Paxil, and Atenolol.  [T. 133].  The Plaintiff reported that she had undergone outpatient surgery for her kidney problems.  [T. 135].

4.    Evidence Presented to the Appeals Council.  In a letter to the Appeals Council dated April 24, 2006, the Plaintiff's attorney took issue with the ALJ's decision to reject the opinion of Dr. Plachta.  [T. 752].  The Plaintiff's attorney contended that Dr. Plachta's opinion was rejected solely because it had been solicited by the Plaintiff.  [T. 753].  He also contended that the Plaintiff's mental impairment had worsened since May of 2005.  [T. 753-54].  The Plaintiff's attorney argued that, given the Plaintiff's recent GAF score of 42, the Plaintiff was unable to maintain employment.  [T. 754].   Accordingly, the Plaintiff's attorney argued that the ALJ

should have considered an onset date of May of 2005, with respect to the Plaintiff's mental impairment. Id.

The Plaintiff also submitted updated records from her therapy sessions, from October of 2005, through March of 2006. [T. 759-779]. During that time, the Plaintiff's condition vacillated at times between improvement, [T. 761, 765], and deterioration. [T. 763, 766, 773, 774, 776].

The Plaintiff also submitted her updated medical records. On November 28, 2005, the Plaintiff was seen by Dr. Joseph Martinelli, a pulmonary specialist, based on her persistent symptoms, her leukocytosis, and some abnormalities on her CT scan, which revealed some bilateral patchy infiltrates in her lungs. [T. 790-91]. On November 29, 2005, the Plaintiff underwent pulmonary function tests, the results of which were within normal limits. [T. 792]. Dr. Martinelli recommended discontinuing her use of perfume, and undergoing a bronchoscopy to assess for chronic infections, and to rule out sarcoidosis.[37] [T. 791]. At a follow-up visit on December 28, 2005, Dr. Martinelli observed that the Plaintiff's bronchoscopy, and biopsies, had not

---

[37]Sarcoidosis is "a chronic, progressive, systemic granulomatous reticulosis of unknown etiology[.]" Dorland's Illustrated Medical Dictionary, at 1599 (29th Ed. 2000).

revealed any granulomatous disease.   [T. 789].   He prescribed Prednisone,[38] and recommended a follow-up CT scan.   Id.

On January 30, 2006, the Plaintiff was seen for a follow-up visit, and Dr. Martinelli observed that the Plaintiff was doing well with Prednisone.   [T. 786].   He diagnosed probable polymyalgia rheumatica,[39] and recommended continuing on Prednisone.   Id.

B.   Hearing Testimony.   The Hearing on October 20, 2005, commenced with some opening remarks by the ALJ, in which she noted the appearance of the parties for the Record.   [T. 798-99].   The ALJ asked the Plaintiff's attorney if he had any objections to the evidence being introduced into the Record, and the Plaintiff's attorney stated that he did not.   [T. 799].   The Plaintiff's attorney informed the ALJ that he wished to submit the Plaintiff's recent medical records, after the Hearing.   [T.

---

[38]Prednisone is an "anti-inflammatory and immunosuppressant," used "in a wide variety of disorders."   Dorland's Illustrated Medical Dictionary, at 1450 (29th Ed. 2000).

[39]Polymyalgia rheumatica is "a syndrome in the elderly characterized by proximal joint and muscle pain and a high erythrocyte sedimentation rate[.]"   Dorland's Illustrated Medical Dictionary, at 1432 (29th Ed. 2000).   An erythrocyte is "one of the elements found in peripheral blood," which is "adapted by virtue of its configuration and its hemoglobin content to the transport of oxygen."   Id. at 618.

- 37 -

798-99].  The ALJ agreed to hold the Record open for twenty (20) days, so as to permit submission of those records.  [T. 799].

Next, the ALJ asked the Plaintiff's attorney if he would like to make any preliminary remarks.  [T. 799].  The Plaintiff's attorney informed the ALJ that the Plaintiff suffered from a number of medical problems, most recently involving her internal organs.  [T. 799-800].  The Plaintiff's attorney advised the ALJ that the Plaintiff would be seen by an oncologist later that day, and had recently been seen by an infectious disease specialist.  [T. 800].  In addition, the Plaintiff's attorney observed that the Plaintiff's psychological condition had worsened in the past year, and that her GAF score had been 42 in May of 2005.  Id.

The ALJ then swore the Plaintiff to testify, and began her questioning by asking the Plaintiff about her education.  [T. 800-01].  The Plaintiff testified that she had completed high school, and one (1) year of college in computer technology.  [T. 801].  The Plaintiff also stated that she had recently taken courses at Lake Superior College toward a psychology degree, before her illness prevented her studies.  [T. 801-02].  She then continued her coursework online.  [T. 802].

In response to the ALJ's inquiry, the Plaintiff testified that she was currently unable to work due to pain in her groin, and under her arms.  [T. 803].  The Plaintiff

reported that, after her kidney surgery, she had suffered complications, including infection.  Id.  She testified that she had difficulty climbing the stairs in her home to her bedroom.  Id.  The Plaintiff also testified that she had lost strength in her legs, and that she did not exercise, because physical therapy had caused her additional pain.  [T. 804].  The ALJ asked the Plaintiff what she did to alleviate her pain, and the Plaintiff replied that she would lie down.  Id.

The Plaintiff testified that she was then taking Tramadol or Ultram, Amitriptyline, Paxil, and Tylenol.  [T. 804-05].  She testified that she had a fever almost daily, and that her fevers worsened her pain.  [T. 805].  She also testified that she had been hospitalized three (3) times that year for infection, following her kidney surgery.  Id.  The Plaintiff stated that she also struggled with depression and anxiety, although she denied any hospitalization for mental health concerns.  [T. 806].  The Plaintiff testified that she was frustrated that her pain had rendered her inactive, and unable to work or attend school.  Id.

The ALJ asked how far the Plaintiff could walk, and the Plaintiff replied that she could walk one (1) block without pain.  [T. 807].  The Plaintiff testified that she could also sit for twenty (20) to thirty (30) minutes, and stand for fifteen (15) minutes.  Id.  She stated that the most she had lifted in recent years was five (5) pounds.  [T. 808].

The Plaintiff reported that her neighbor helped her with grocery shopping, cleaning, and cooking, although she was able to cook frozen meals in her microwave and do dishes.  [T. 808].  She also showered, at her neighbor's house, a couple of times per week.  Id.

The Plaintiff stated that her only income was from past-due child support, in the amount of $342.00 per month.  [T. 809].  The Plaintiff testified that her family did not live nearby, and that she had not been able to travel, to see her son in South Dakota, for one (1) year.  Id.   The ALJ asked if she had any hobbies, and the Plaintiff stated that she enjoyed painting, writing, and being outdoors, but that she had not been able to engage in any hobbies lately.  [T. 810].  The Plaintiff testified that she had not been employed since August of 2002.  Id.

The Plaintiff's attorney then asked the Plaintiff about her hobbies.  [T. 811].  The Plaintiff explained that she had not engaged in any of those activities for approximately eighteen (18) months, and that she had lost interest in her hobbies.  [T. 811-12].  The Plaintiff testified that she had not seen her son in one (1) year, but that, approximately ten (10) days before the Hearing, she traveled two (2) hours, for a three (3) day visit with her mother.  [T. 809, 812].  The Plaintiff stated that her pain medication caused dizziness and fatigue, which counseled against driving long

distances.  [T. 812-13].  The Plaintiff testified that she typically slept for twelve (12) hours per night, and that she spent five (5) to six (6) of her waking hours lying down. [T. 813].

Next, the Plaintiff's attorney asked the Plaintiff about her fevers.  The Plaintiff testified that she kept a record of her fevers, and that she had a fever ninety-eight (98) percent of the time.  [T. 814].

The ALJ then asked the vocational expert ("VE") if he had any questions for the Plaintiff.  [T. 814].  The VE asked the Plaintiff about her prior ownership of a distribution business.   Id.  The Plaintiff testified that she and her ex-husband had operated a distribution business, for bottled water, during their marriage.  [T. 814-15]. The Plaintiff testified that she kept the books and made deliveries, and that five (5) years earlier, she had been capable of lifting bottled water.  [T. 814].  The Plaintiff stated that she had also worked part-time as a salesperson for the company.  [T. 815].

Next, the VE advised that he wished to amend his report, in order to include skills relating to sales and bookkeeping, based on the Plaintiff's testimony.  [T. 816]. The ALJ then posed a hypothetical to the VE, in which she asked the VE to assume an individual with a high school education, plus some college, who was forty-six (46) years old, with past work experience as set out in the VE's amended report, and with

- 41 -

the impairments noted in the Record, including affective mood disorder with anxiety, degenerative disc and joint disease, obesity, kidney and urethra problems, infections, and fevers.  [T. 816].  The individual was taking medication with resulted in dizziness and fatigue.  Id.  The individual was limited to lifting no more than twenty (20) pounds occasionally, and ten (10) pounds frequently, but would be capable of performing light work, with no crouching or crawling, no heights, ladders, or scaffolding, and occasional bending, stooping, twisting, and climbing.  Id.  The individual would be limited to unskilled or semi-skilled work, due to depression and anxiety.  [T. 817].

The ALJ asked the VE if such an individual could perform the Plaintiff's past relevant work.  Id.  The VE explained that the individual could work as a cashier, and that 5,000 such positions existed in the State of Minnesota; and that the individual could work as a receptionist, and that 2,000 such positions existed in the State of Minnesota.  Id.

The ALJ then amended the hypothetical, so as to limit the individual to lifting ten (10) pounds occasionally, and five (5) pounds frequently.  Id.  The VE explained that the individual could still work as a receptionist, and that 2,000 such positions existed in the State of Minnesota.  Id.  The VE then advised that the individual could also perform sedentary work, as a security monitor, and that 1,000 such jobs existed in the

State of Minnesota; as a companion, and that 1,000 such jobs existed in the State of Minnesota; or as a polisher or deburrer, and that 1,200 such jobs existed in the State of Minnesota.  [T. 818].

Finally, the ALJ amended the hypothetical, so as to assume an individual who would be absent from work more than three (3) days per month, due to infections, pain, and depression.  [T. 819].  The VE advised that the individual would be unable to find work in the regional or national economy.  Id.

Next the Plaintiff's attorney asked the VE how his testimony regarding the first hypothetical would change if the individual needed to lie down, more than three (3) times per day.  Id.  The VE testified that the individual would not be able to perform the previously mentioned sedentary work.  Id.

Last, the ALJ asked the Plaintiff about her tobacco habit. [T. 820].  The Plaintiff testified that she smoked one (1) pack of cigarettes per week, but that she had previously smoked up to one-half of a pack per day.  Id.

C.    The ALJ's Decision.  The ALJ issued her decision on March 23, 2006. [T. 15-26].  As she was required to do, the ALJ applied the sequential, five-step

analytical process, that is prescribed by 20 C.F.R. §§404.1520 and 416.920.[40]   As a

threshold matter, the ALJ noted that, on September 22, 2003, the Plaintiff had filed a

protective application for DIB.   [T. 15].   The ALJ noted that the Plaintiff had earned

$843.77, from her prior employer, during the year 2003.   [T. 17, 66].   However, in

reliance on the Plaintiff's testimony, that she did not work after August 25, 2002, the

---

[40]Under the five-step sequential process, the ALJ analyzes the evidence as follows:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has an impairment that limits his ability to perform basic work activities; and his impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work, and he cannot perform other work existing in the national economy.   Id. at 754.

ALJ concluded that the Plaintiff had not engaged in substantial gainful activity since her alleged onset date of August 25, 2002.  [T. 17].

Next, at the Second Step, the ALJ examined whether the Plaintiff was subject to any severe physical impairments, which would substantially compromise her ability to engage in gainful work activity.  [T. 17-18].  After considering the Plaintiff's medical history, which included the reports of the Plaintiff's treating physicians, and the testimony adduced at the Hearing, the ALJ found that the Plaintiff was severely impaired by affective mood disorder with anxiety; degenerative disc disease, and degenerative joint disease, following her back fusion; obesity; and nephrolithiasis.  Id. The ALJ further noted the Plaintiff's diagnoses of hypertension, chronic sinusitis, diverticulosis, malaise, and fibromyalgia, but she concluded that those conditions had not, and did, not prevent the Plaintiff from engaging in substantial gainful employment. [T. 18].

At the Third Step, the ALJ compared the Plaintiff's severe impairments with the impairments contained in Appendix 1, Subpart P, of the Regulations.  See, 20 C.F.R. §§404.1520(d), and 416.920(d).  The ALJ determined that the Plaintiff's physical and mental impairments did not meet, or equal, the criteria of any Listed Impairment, based upon the Record as a whole.  [T. 18].

- 45 -

The ALJ then discussed the signs, symptoms, and other medical findings, which established the existence of a mental impairment, and evaluated them under the required procedure. See, 20 C.F.R. §§404.1520a and 416.920(a). The four broad areas, which are relevant to an ability to work, are: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. Id. After examining the medical evidence, the ALJ observed that the Plaintiff was subject to a Section 12.06 Anxiety Disorder, which is characterized by panic attacks with generalized anxiety, and a Section 12.04 Affective Disorder, which is characterized by depression, not otherwise specified. [T. 19].

However, the ALJ concluded that the Plaintiff was only mildly restricted in her ability to maintain social functioning and concentration, and to perform activities of daily living. Id. The ALJ observed that the Plaintiff was initially diagnosed with her mood disorder in March of 2001, but that she was able to continue working. Id. She did note that the Plaintiff had experienced one (1) or two (2) episodes of decompensation, of extended duration. Id. The ALJ observed that, after the death of her father, the Plaintiff's GAF score indicated serious impairment in social functioning. Id. However, the Plaintiff's symptoms had significantly improved in November of 2002, and in January of 2003, the Plaintiff's condition was stable. Id.

- 46 -

The ALJ observed that, although the Plaintiff's GAF scores sometimes indicated moderate to serious symptoms, the Plaintiff's physician reported that her depression had improved.   [T. 20].

The ALJ further observed that the Plaintiff maintained good hygiene and personal care, that she lived independently and managed her own finances, and that she was able to write fiction and take college coursework.   Id.   Accordingly, the ALJ found that the Plaintiff's mental impairments did not meet, or medically equal, the "C" criteria, as set forth in Section 12.00 of the Listings.   [T. 21].   The ALJ based that determination on the conclusions of the State Agency physician, the records from the Plaintiff's treating physicians, and the evidence as a whole.   [T. 18-21].   The ALJ's review of the functional limitations experienced by the Plaintiff, as a result of her affective mood disorder with anxiety, showed that they were severe, but did not meet or equal the criteria of Section 12.04 of the Listing of Impairments.   [T. 21].[41]

The ALJ then proceeded to determine whether the Plaintiff retained the "residual functional capacity" ("RFC") to engage in the duties required by her past relevant

---

[41]The Plaintiff does not contest the ALJ's determinations at Step Three.  See, Plaintiff's Memorandum in Support of Summary Judgment, Docket No. 7, at p. 7 ("[I]t is undisputed that * * * Ms. Scott's severe impairments do not meet or equal a listed impairment.").

work, or whether she was capable of engaging in other work which existed in significant numbers in the national economy. Id. RFC is defined in the Regulations as the most an individual can still do after considering the effects of physical limitations that can affect the ability to perform work-related tasks. See, Title 20 C.F.R. §§404.1545, and 416.945, and Social Security Ruling 96-8p. The ALJ recognized that, in order to arrive at the Plaintiff's RFC, she was obligated to consider all of the symptoms, including the Plaintiff's subjective complaints of pain, and that those complaints were to be evaluated under the standard announced in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), Social Security Ruling 96-7p, and Title 20 C.F.R. §§404.1529 and 416.920(a).

After considering the entire Record, including the testimony adduced at the Hearing; the opinions of the Plaintiff's treating physicians; the opinions of the consultative psychologist; the objective medical evidence; and the Plaintiff's subjective complaints of pain; the ALJ determined the Plaintiff's RFC to be as follows:

> [The Plaintiff] has the residual functional capacity to perform a range of light work lifting 20 pounds occasionally and ten pounds frequently, sitting, standing and walking each up to six of eight hours, but with no crouching or crawling, no more than occasional bending, stooping, or twisting, no heights, ladders or scaffolding and due to any

combination of depression, anxiety and pain for unskilled to
semi-skilled work.

[T.21].

In determining the Plaintiff's RFC, the ALJ evaluated the physical and mental

impairments using the procedures set out in 20 C.F.R. §§404.1520a, and 416.920(a).

Id.  The ALJ concluded that the Plaintiff's testimony "regarding an inability to work

was not wholly credible due to substantial inconsistencies in the record as a whole."

[T. 21].

The ALJ concluded that the objective medical evidence failed to support the

Plaintiff's contention, that her conditions were so severe as to cause disability.  [T.

22].  She noted that the Plaintiff's physical conditions existed prior to her alleged onset

date, and that those conditions did not then prevent the Plaintiff from working.  Id.

She further noted that the Plaintiff chose not to return to work, following her father's

death, not because of any disabling condition, but because the Plaintiff wanted to start

her own business and take college coursework.  Id.  The ALJ explained that the

Plaintiff had been released to work, without any restrictions, in February of 2003.  Id.

The ALJ further noted that the Plaintiff had suffered from degenerative disease

of her cervical spine in the year 2000, but was able to work through August of 2002.

Id.  She related that the Plaintiff's cervical surgery had been successful, and had

- 49 -

improved her condition.  Id.  Even after the Plaintiff alleged that her symptoms had worsened, in April of 2003, her range of motion was only slightly limited, and physical therapy improved her symptoms.  Id.  Moreover, according to the ALJ, the Plaintiff cancelled physical therapy appointments, notwithstanding her alleged neck pain.  Id. With respect to the Plaintiff's degenerative disease of the lumbar spine, and degenerative joint disease, the ALJ related that the Plaintiff's disease was mild, and required only conservative treatment. [T. 22-23].

In addition, the ALJ described the Plaintiff's obesity as not morbid, and as not requiring treatment.  [T. 23].  Moreover, the Plaintiff's kidney problems began long before her alleged onset date, and did not then prevent the Plaintiff from working.  Id. Although the Plaintiff experienced groin and flank pain, the objective medical evidence did not reveal an obstruction, or any malfunction, of the Plaintiff's kidneys.  Id.

The ALJ also concluded that the Plaintiff's activities of daily living were inconsistent with her claimed disability.  [T. 25].  As noted by the ALJ, the Plaintiff reported that she lived alone, with a bedroom on the second floor, wrote fiction, used a computer, and took online college coursework, and that she had cleaned her deceased father's house, and traveled to see her son, all after her alleged onset date.

Id.  Although the Plaintiff alleged that she had to lie down during the day, the ALJ observed that no medical opinion, report, or evidence, supported that contention.  Id.

The ALJ arrived at the Plaintiff's RFC after considering the Plaintiff's entire medical file.  [T. 21-23].  The ALJ stated that she gave no weight to the opinion of Dr. Plachta, concluding that his opinion was a "generic statement," "made at the claimant's representative's request."  [T. 24].  The ALJ further concluded that Dr. Plachta's opinion was not supported by, but was inconsistent with, other evidence. Id.  She noted, in particular, that Dr. Plachta identified a number of the Plaintiff's medical problems, which preceded her alleged onset date, and which had not then precluded the Plaintiff from working.  Id.  The ALJ noted that Dr. Plachta also identified a number of other conditions, which were not severe.  Id.  Instead, the ALJ relied on the opinions of the State Agency consultants, who concluded that the Plaintiff should be restricted to light work activities, based on her limitations in exertion and posture.  [T. 23].  The ALJ did not adopt other restrictions recommended by the State Agency consultants, given that the Plaintiff's later medical records did not indicate ongoing neck pain, strength loss, or significantly limited range of motion. [T. 24].

With respect to the Plaintiff's mental impairments, the ALJ relied on the opinion of Dr. Trulsen. [T. 24].  Although the State Agency consultants had concluded that the Plaintiff suffered mildly to moderately severe symptoms of a mental impairment, the ALJ concluded that such severity only occurred for brief and infrequent periods. Id.  Accordingly, the ALJ rejected the work restrictions, which were recommended by the State Agency consultants, with respect to the Plaintiff's mental impairments.  [T. 25].  The ALJ also rejected the Plaintiff's claim that her RFC should reflect her need to lie down during the day, concluding that none of the Plaintiff's medical records supported such a restriction.

Based upon her findings, the ALJ found that the extent of the Plaintiff's subjective complaints, and her alleged limitations, were not entirely credible.  [T. 25]. She noted that the Plaintiff originally decided not to return to her employment, in order to start her own business -- not due to medical problems -- and had received a substantial amount of money from her father.  Id.  The ALJ also observed that, after the Plaintiff filed her application for DIB, the Plaintiff's significant financial problems came to light.  Id.

Proceeding to the Fourth Step, the ALJ determined that the Plaintiff was capable of performing her past relevant work as a cashier or receptionist.  Id.  The ALJ

concluded that the Plaintiff had held those positions long enough to learn such semi-skilled work, and that the Plaintiff's work experience as a cashier and receptionist amounted to substantial gainful activity. Id. The ALJ further concluded, based on the testimony of the VE, that the Plaintiff's RFC permitted work as either a cashier or a receptionist. Id. As a result, the ALJ concluded that the Plaintiff was not disabled. Id.

## IV. Discussion

A. <u>Standard of Review</u>. The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole. See, Title 42 U.S.C. §405(g); see also, Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998). This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision. See, Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994), citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951). Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998); Moore ex rel. Moore v. Barnhart, supra at 721, and the notable distinction between "substantial evidence," and "substantial

evidence on the record as a whole," must be observed.  See, Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998).  On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied.  See, Loving v. Secretary of Health and Human Services, 16 F.3d 967, 969 (8th Cir. 1994); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  See, Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005), citing Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001).  Stated otherwise, substantial evidence "is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir. 2006).  Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'"  Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. 2005), quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004);

Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001), quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996).   Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result.   See, Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal.   See, Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006), citing Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); see also, Haley v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995), or 'because we would have decided the case differently.'"), quoting Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001).   Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record de novo.   See, Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Flynn v.

Chater, 107 F.3d 617, 620 (8th Cir. 1997); Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996).

Lastly, where, as here, the Plaintiff submits additional evidence to the Appeals Council for review, which was not considered by the ALJ, our task on review is not completed until we "determine whether the ALJ's decision 'is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made.'" Bergmann v. Apfel, 207 F.3d 1065, 1068 (8th Cir. 2000), quoting Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1999); see also, Flynn v. Chater, 107 F.3d 617, 621 (8th Cir. 1997). "Evaluating such evidence requires us to determine how the ALJ would have weighed the newly submitted evidence if it had been presented at the original hearing." Jenkins v. Apfel, 196 F.3d 922, 924 (8th Cir. 1999), citing Riley v. Shalala, supra at 622.

B.     Legal Analysis.   In support of her Motion for Summary Judgment, the only issue raised by the Plaintiff is whether the ALJ failed to give the proper weight to the opinion of her treating physician, Dr. Plachta.  See, Plaintiff's Memorandum, Docket No. 7, at 6, 8-9.

1.     Standard of Review.   When a case involves medical opinion -- which is defined as "statements from physicians and psychologists or other acceptable

medical sources" -- the opinion of a treating physician must be afforded substantial weight.  20 C.F.R. §§404.1527 and 416.927; see also, Forehand v. Barnhart, 364 F.3d 984, 986 (8th Cir. 2004); Burress v. Apfel, 141 F.3d 875, 880 (8th Cir. 1998); Grebenick v. Chater, 121 F.3d 1193, 1199 (8th Cir. 1997); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996).  Nevertheless, an opinion rendered by a claimant's treating physician is not necessarily conclusive.  See, Forehand v. Barnhart, supra at 986 ("A treating physician's opinion is generally entitled to substantial weight, although it is not conclusive and must be supported by medically acceptable clinical and diagnostic data."), quoting Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998).

An ALJ may discount a treating physician's medical opinion, and adopt the contrary medical opinion of a consulting physician, when the treating source's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the Record as a whole.  See, Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997); Pena v. Chater, supra at 908; Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991); Kirby v. Sullivan, 923 F.2d 1323, 1328 (8th Cir. 1991); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986).

The opinion of a treating physician may also be discounted if other assessments are supported by better, or by more thorough, medical evidence. See, Rogers v. Chater, supra at 602; Ward v. Heckler, supra at 846. In short, the ALJ is not required to believe the opinion of a treating physician when, on balance, the medical evidence convinces her otherwise. Id. As but one example, a treating physician's opinion is not entitled to its usual substantial weight when it is, essentially, a vague, conclusory statement. See, Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996), citing Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991). Rather, conclusory opinions, which are rendered by a treating physician, are not entitled to greater weight than any other physician's opinion. Id.; Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995).

The Code of Federal Regulations sets forth additional factors to assist the ALJ in determining what weight should be accorded to the opinion of a given physician, including a treating physician. The Regulations encourage the ALJ to afford more weight to those opinions which are "more consistent with the record as a whole." See, 20 C.F.R. §§404.1527(d)(4) and 416.927(d)(4). More weight is also to be extended to "the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." See, 20 C.F.R. §§404.1527(d)(5) and 416.927(d)(5). When presented with a treating physician's

opinion, the ALJ is obligated to examine the nature and extent of the treatment relationship, attributing weight to such an opinion that is proportionate to the knowledge that the medical provider has about the claimant's impairments.  See, 20 C.F.R. §§404.1527(d)(2)(ii) and 416.927(d)(2)(ii).  Further, the Regulations make clear that the opinions of treating physicians, on questions reserved for the Commissioner -- such as whether a claimant is disabled, or is unable to work -- are not to be given any weight by the ALJ.  See, 20 C.F.R. §§404.1527(e)(1) and 416.927(e)(1).

2.    Legal Analysis.  The Plaintiff argues that the ALJ erred in rejecting Dr. Plachta's opinion, since he was her primary treating physician.  We disagree, for we find that, when the evidence of Record is viewed in its totality, Dr. Plachta's opinion, that the Plaintiff was unable to engage in competitive, full-time employment, was conclusory, and not supported by substantial evidence.

As previously noted, the ALJ need not give any weight to a consultative, or a treating physician's conclusory statements regarding total disability.  See, 20 C.F.R. §§404.1527(e)(1), and 416.927(e)(1); Rogers v. Chater, supra at 602.  If justified by substantial evidence in the Record as a whole, the ALJ can discount the examining, or treating physician's opinion.  See, Rogers v. Chater, supra at 602; Ward v. Heckler, supra at 846.  As noted, Dr. Plachta concluded, in August of 2005, that the Plaintiff

was unable to be productively employed due to her multiple medical diagnoses. [T. 606-07]. In addition, the Plaintiff contends that Dr. Plachta's opinion supports her assertion, that she is not able to perform her past relevant work, because those medical conditions would result in excessive absenteeism. See, Plaintiff's Memorandum in Support, supra at 10.

The ALJ concluded that Dr. Plachta's opinion was not supported by substantial evidence in the Record as a whole, and accordingly, she declined to afford it any weight. [T. 24]. The ALJ observed that many of the medical conditions, which were identified by Dr. Plachta, had existed prior to the Plaintiff's alleged onset date, but had not then prevented her from working. Id. She further observed that some of the medical conditions, which were identified by Dr. Plachta, were not severe, and were of unknown origin, such as the Plaintiff's low-grade fevers. Id. The ALJ noted that many of the Plaintiff's medical problems had been of short duration, and had been resolved by treatment, and accordingly, did not support a finding that the Plaintiff suffered any disabling impairment which had lasted for a continuous period of twelve (12) full months. Id.

Moreover, the ALJ pointed out that the Record established that the Plaintiff had chosen not to return to work in 2003, not due to any disability, but because she

wanted to start her own business, and take classes.  Id. at 22.  She observed that the Plaintiff had not attempted any return to employment, since her alleged date of onset. Id. at 24.  The ALJ explained that, notwithstanding Dr. Plachta's assertion of total disability, the Plaintiff was able to live independently, manage her own finances, and maintain good hygiene and personal care. [T. 19-20, 25]; see, 20 C.F.R. §404.1529(c) (4) (The ALJ "will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence.").  As a consequence, the ALJ concluded that Dr. Plachta's opinion was inconsistent with the substantial evidence on the Record as a whole.  Id. at 24.

Of course, we do not suggest anything untoward on Dr. Plachta's part.  He was expressing an opinion, as to the Plaintiff's employability, based upon information that is not fully detailed in his opinion letter, but which resulted in his conclusory view that he did not "believe that she is able to sustain full-time, competitive employment as defined by Social Security Disability because of the above medical problems."  [T. 606].  The ALJ did not ignore, or overlook, Dr. Plachta's assessment, but addressed its substance in the context of the Record as a whole, and as she was obligated to do under the Social Security Regulations, and the governing law of this Circuit.  See, e.g.,

Samons v. Astrue, 497 F.3d 813, 819 (8th Cir. 2007)("Though a treating doctor's opinion that the claimant cannot return to work, combined with other medical information, may assist an ALJ determining whether a claimant is disabled, see e.g., Bergmann v. Apfel, 207 F.3d 1065, 1070-71 (8th Cir. 2000), such an opinion cannot resolve the issue, see Chamberlain [v. Shalala, 47 F.3d [1489,] 1494 [(8th Cir. 1995)].");  Vandenboom v. Barnhart, supra at 750 ("Dr. Hines was of the opinion that Vandenboom would not be able to return to work, but a treating physician's opinion that a claimant is not able to return to work 'involves an issue reserved for the Commissioner and therefore is not the type of "medical opinion" to which the Commissioner gives controlling weight.'"), quoting Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005).  Were treating physicians the arbiter of whether DIB should be awarded, or denied, with nothing more than a conclusory acceptance, or rejection, then the elaborate administrative process, which governs the award of such benefits, would be rendered useless.  Here, we find that the ALJ properly exhausted her responsibility to consider all of the evidence of Record, inclusive of Dr. Plachta's opinions, and form a judgment based on the evidence as a whole.  In this respect, the ALJ did not err.

In declining to give substantial weight to Dr. Plachta's opinion, the ALJ instead relied upon the opinion of the State Agency physicians, who had evaluated the Plaintiff's RFC, and who had recommended light work activities.  [T. 23]; see also, 20 C.F.R. §404.1527(f)(2)(i) ("State agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation.").  The ALJ observed that the Plaintiff's degenerative disc disease, obesity, and nephrolithiasis, in combination, could limit her exertion and posture.  [T. 24].

The State Agency physicians had recommended restrictions in terms of vibration and manipulation, with respect to the Plaintiff's upper extremities, but the ALJ noted that later medical evidence revealed no indication of a limited range of motion or strength loss, nor had the Plaintiff later complained of neck pain.  Id. Accordingly, the ALJ concluded that certain of the recommended restrictions, as prescribed by the State Agency physicians, were unsupported by later medical evidence.  Id.  However, the ALJ credited the Plaintiff's complaints about side-effects, due to her medications, and accordingly, limited the Plaintiff to semiskilled work, and restricted her exposure to heights, ladders, and scaffolding.  Id.

In addition, the ALJ observed that some medical records showed that the Plaintiff had been subject to work limitations, but that the Plaintiff had later returned to work, all before her alleged onset date.  Id.  The ALJ further observed that the Plaintiff had been fully released to work from February of 2003, through June of 2003, shortly after her alleged onset date.  Id.  Accordingly, the ALJ gave little weight to the Plaintiff's work restrictions, which predated her alleged onset date.  Id.

With respect to the Plaintiff's mental impairments, the ALJ relied upon the clinical observations and opinions of Dr. Trulsen, who concluded that the Plaintiff was capable of regular interaction with others, following through on tasks, and respecting authority.  [T. 24, 305].  Dr. Trulsen opined that the Plaintiff was capable of maintaining employment, based on her reported symptoms, and daily living activities.  Id.  As a result, the ALJ concluded that the Record as a whole did not support the Plaintiff's contention that her symptoms were severe, as reported by the State Agency consultants, except for brief, limited periods.  [T. 24-25].

The State Agency consultants had concluded that the Plaintiff would have moderate difficulty in maintaining concentration, pace, and persistence, but the ALJ noted that the Plaintiff later took college courses online, and wrote fiction.  [T. 20].  The ALJ observed that the State Agency consultants had not had the opportunity to

review those later records, [T. 19], and she declined to give significant weight to their recommended restrictions, with respect to the Plaintiff's mental impairments. [T. 20, 24]. Rather, the ALJ concluded that the evidence, as a whole, demonstrated only mild difficulty with concentration, pace and persistence. Id.

Under the circumstances, here, we are aware of no authority that the ALJ must abdicate her obligation to assess credibility, and to weigh conflicting medical opinions, simply because a medical source has expressed, in solely conclusory terms, opinions as to the Plaintiff's inability to work. See, e.g., Ellis v. Barnhart, supra at 994 ("A medical source opinion that an applicant is 'disabled' or 'unable to work,' however, involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight."), citing Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004). As a consequence, we find that the ALJ fulfilled her responsibilities under the Regulations, by explaining, and justifying, the weight that was given to each of the medical source opinions, and why she found some opinions more persuasive than others. See, 20 C.F.R. §404.1527(f)(2)(ii).

We are mindful that the ALJ was confronted by competing and conflicting medical opinions, as professed by consultative, and treating physicians and, under

- 65 -

those circumstances, the ALJ's obligation is to weigh the competing evidence and draw findings based upon the substantial weight of the evidence of Record. Consistent with her "function to resolve conflicts among the various treating and examining physicians," Tindell v. Barnhart, 444 F.3d 1002, 1004 (8th Cir. 2006), quoting Vandenboom v. Barnhart, supra at 749-50, the ALJ thoroughly reviewed the entirety of the Record, and based her resolution of the medical disputes on substantial evidence. We do not suggest that, were we to consider the matter as one of first impression, we would have reached the same result, for we simply acknowledge that the resolution that the ALJ reached was well within the Commissioner's "zone of choice." See, Vandenboom v. Barnhart, supra at 749, citing, and quoting, Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004).

However, where, as here, medical evidence conflicts, the obligation of the ALJ is to consider "all of the medical evidence, including [the ME's testimony], weigh[] this evidence in accordance with the applicable standards, and attempt[] to resolve the various conflicts and inconsistencies in the record." Hudson ex. rel. Jones v. Barnhart, 345 F.3d 661, 667 (8th Cir. 2003). After close review, we are satisfied that the ALJ properly weighed the medical opinions in the record, and afforded those opinions the weight they deserved when considered on the Record as a whole. See,

Bentley v. Shalala, 52 F.3d 784, 785 (8th Cir. 1995)("It is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'"), quoting Cabrnoch v. Bowen, 881 F.2d 561, 564 (8th Cir.1989).  Based on the lack of objective medical evidence in the Record, that would support the Plaintiff's claim of inability to engage in her past relevant work, we conclude that the ALJ's denial of DIB was supported by substantial evidence in the Record as a whole.[42]

While we find the ALJ's decision to be supported by substantial evidence, as we have previously noted, our analysis does not stop with an appraisal of the Record that had been submitted to the ALJ, for we have an obligation to assess whether the

---

[42]We note here that the Plaintiff also complains that the ALJ improperly rejected Dr. Plachta's opinion, in part, because her attorney had solicited that opinion, in support of the Plaintiff's claim for DIB.  See, Plaintiff's Memorandum in Support, supra at 9.  We conclude that the ALJ was rejecting only Dr. Plachta's conclusory statement, that the Plaintiff was unable to work -- a conclusion that she was entitled to reject, pursuant to 20 C.F.R. §§404.1527(e)(1), and 416.927(e)(1) --  and not all of Dr. Plachta's medical opinions, as expressed in the Plaintiff's medical records.  [T. 24].  Moreover, we note that the ALJ was entitled to reject the entirety of Dr. Plachta's opinion, given her conclusion that it was inconsistent with the evidence as a whole.  See, Wagner v. Astrue, 499 F.3d 842, 850 (8th Cir. 2007); Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007); Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005)(ALJ entitled to reject an internally inconsistent opinion, from a treating specialist).  Accordingly, we find no basis for the Plaintiff's contention that the ALJ improperly disregarded Dr. Plachta's opinion because it responded to an inquiry from the Plaintiff's attorney.

information, that the Plaintiff submitted to the Appeals Council, would have counseled a different decision, or warrants a remand.  In support of her appeal, the Plaintiff submitted a letter from her attorney dated April 24, 2006, in which he contended that the Plaintiff's mental impairment had worsened since May of 2005, and that the Plaintiff's recent GAF score of 42 reflected that the Plaintiff was unable to maintain employment.  [T. 753-54].  Accordingly, the Plaintiff's attorney argued that the ALJ should have considered an onset date of May of 2005, with respect to the Plaintiff's mental impairment.  Id.

However, the ALJ's decision reveals that she specifically addressed the Plaintiff's low GAF score in May of 2005, and her mental health condition since that date.  [T. 20-21].  The ALJ observed that, by June of 2005, the Plaintiff's treating physician noted that her depression had improved and, by July of 2005, the Plaintiff's therapist anticipated a complete resolution of the Plaintiff's symptoms by December of 2005.  [T. 20].  Indeed, by September of 2005, the Plaintiff reported only mild symptoms.  Id.  The ALJ concluded that the Plaintiff's GAF score, in May of 2005, might simply indicate that she had suffered another episode of decompensation.  [T. 21].  However, the ALJ stated that the Plaintiff's GAF score was not "well-supported," given that the Plaintiff's functional assessment, at that time, demonstrated

that the Plaintiff was "well-groomed, cooperative, alert, oriented, with memory intact, with normal speech, with thoughts clear and relevant, and without risk for harmful behavior[.]" Id.

We conclude that the arguments, which were raised by the Plaintiff's counsel in his letter to the Appeals Council, were drawn to the attention of the ALJ before her decision, were considered, and subsequently rejected, in accordance with the substantial weight of the evidence.

The Plaintiff also submitted records of her therapy sessions from Nystrom and Associates, dated October 10, 2005, through March 27, 2006, which reflected that her mental health fluctuated between deterioration, stability, and improvement. [T. 759-84]. However, in her decision, the ALJ catalogued the history of the Plaintiff's mental impairments, beginning with her diagnosis in March of 2001, and continuing through October of 2005. [T. 19-21]. The ALJ observed that the Plaintiff had experienced "one or two episodes of decompensation of extended duration," over those several years. [T. 19].

Although the ALJ observed that the records from October of 2005 did not reveal any current depression, [T. 20], and although the Plaintiff later reported symptoms of depression to her therapist, in her decision the ALJ observed that the

Plaintiff's mental health history revealed only limited periods of mild to moderate symptoms of depression, and often included periods of several months in which the Plaintiff sought no treatment at all.  [T. 19-21].  The medical records from Nystrom and Associates are consistent with the ALJ's assessment of the Plaintiff's mental impairments, and with the fluctuation of her symptoms of depression.  Accordingly, we conclude that those records do not support a reversal of the ALJ's decision.

Next, the Plaintiff provided the Appeals Council with updated medical records from Dr. Plachta, dated October 7, 2005, through January 30, 2006.  [T. 794-95].  The Plaintiff continued to report fevers, and was referred to a hematologist.  [T. 795].  The Plaintiff also underwent a pelvic ultrasound, which revealed two (2) right ovarian cysts.  [T. 794].  However, the ALJ had all of this substantive information prior to her decision, [T. 630, 643], and knew that Dr. Plachta had advised the Plaintiff that her ovarian cysts were "nothing worrisome."  [T. 653].  In addition, the ALJ had records pertaining to the Plaintiff's consultation with the hematologist, and with an infectious disease specialist. [T. 624-27, 648-49, 661-62].  Accordingly, those additional records, which were presented to the Appeals Council, do not support a reversal of the ALJ's decision.

The Plaintiff also submitted medical records from Dr. Martinelli, the pulmonary specialist who examined the Plaintiff in December of 2005, and January of 2006. [T. 785-93]. Those records reveal that the Plaintiff underwent pulmonary function tests, the results of which were within normal limits, [T. 792], and a subsequent bronchoscopy, which revealed no evidence of any granulomatous disease. [T. 789]. Nevertheless, the Plaintiff was prescribed Prednisone.[43]   Id.  At a follow-up visit, Dr. Martinelli observed that the Prednisone had resolved the Plaintiff's fevers, and he diagnosed the Plaintiff with probable polymyalgia rheumatica.  Id.  Admittedly, the ALJ did not have Dr. Martinelli's records before her, and this medical condition did not appear previously in the Plaintiff's medical records.

However, Dr. Martinelli never advised that any joint and muscle pain, due to the Plaintiff's polymyalgia rheumatica, would prevent the Plaintiff from working.  In addition, the ALJ considered the Plaintiff's complaints of musculoskeletal pain, but noted that she had only a slight limitation in her range of motion, and normal strength. [T. 22].  The ALJ also noted that the Plaintiff had cancelled several physical therapy

---

[43]Prednisone is an "anti-inflammatory and immunosuppressant," used "in a wide variety of disorders."  Dorland's Illustrated Medical Dictionary, at 1450 (29th Ed. 2000).

appointments, even after reporting that physical therapy relieved her symptoms.  Id. The ALJ further noted that the Plaintiff's physicians had continually prescribed a conservative course of treatment, which was inconsistent with her reports of severe pain.  [T. 23].

Accordingly, we find nothing in the additional records which would alter the ALJ's core factual findings, or cause the ALJ to alter her decision to deny the Plaintiff's claim for DIB.  As noted, substantial evidence in the Record on the whole, inclusive of the additional records submitted by the Plaintiff to the Appeals Council, fails to demonstrate a disability that precludes the Plaintiff from engaging in substantial gainful activity.   Accordingly, we recommend that the Defendant's Motion for Summary Judgment be granted, and that the Plaintiff's cross-Motion be denied.

NOW, THEREFORE, It is –

RECOMMENDED:

1.     That the Plaintiff's Motion [Docket No. 6] for Summary Judgment be denied.

2.     That the Defendant's Motion [Docket No. 8] for Summary Judgment be granted.

Dated:  December 12, 2007        s/Raymond L. Erickson

                                          Raymond L. Erickson
                                          CHIEF U.S.  MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by no later than **December 31, 2007**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than **December 31, 2007**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.